**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

* * *

LISSETTE WAUGH and WENDY ROBIN,

                 Plaintiffs,

   v.

NEVADA STATE BOARD OF COSMETOLOGY,

                 Defendant.

Case No. 2:12-cv-01039-APG-VCF

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

(Dkt. Nos. 27, 29)

I.     **BACKGROUND**

Plaintiffs Lissette Waugh and Wendy Robin seek to operate makeup artistry schools in Nevada without being licensed as cosmetology or aesthetics instructors, and without their facilities being licensed as cosmetology schools. The Nevada State Board of Cosmetology (the "Board") contends that makeup artistry is a branch of cosmetology, and therefore may be taught only by licensed instructors at licensed schools of cosmetology. The Plaintiffs are not licensed cosmetology or aesthetics instructors and their schools are not licensed schools of cosmetology. The undisputed facts are as follows.

    A.     **Lissette Waugh & L Makeup Institute**

Waugh, a licensed aesthetician in Nevada, owns the L Makeup Institute ("LMI") in Las Vegas, Nevada. In June 2010, Waugh opened LMI to exclusively teach makeup artistry.

In October 2010, in response to an anonymous complaint, the Board contacted Waugh and asked to meet with her at LMI to learn more about her business. Annie Curtis, the Board's Chief Inspector, and Jeffrey Green, a Board inspector (collectively, the "Inspectors"), visited Waugh at LMI. The Inspectors told Waugh that the Board's position was that she was teaching aesthetics without an instructor's license and that LMI was an illegal unlicensed cosmetology school. They also told Waugh that she must stop holding her business out as a makeup artistry school. The

1   Inspectors "made it clear" that the Board believed that LMI fell under the Board's jurisdiction and

2   that in order to advertise LMI as a makeup artistry school, Waugh would have to apply for a

3   cosmetology school license and comply with all regulations governing cosmetology schools.[1]

4   Waugh argued that makeup artistry is distinct from cosmetology; in response, the Inspectors

5   suggested she present her case directly to the Board.  The Inspectors told Waugh to stop charging

6   fees for instruction, and also that she could "essentially continue operating in the same manner,"

7   at least until she met with the Board, if she "changed the words on her website," presumably to

8   stop representing that she was teaching makeup artistry for a fee.[2]

9          In February 2011, Waugh presented her case to the Board.  The Board informed her that

10   the cosmetology licensing scheme applied to her and to her school, and that the only way she

11   could get an exemption from the occupational licensing laws was through the state Legislature.

12   Waugh continues operating LMI as a makeup artistry school, risking punishment under the

13   cosmetology statute including a fine up to $2,000.

14   **B.     Wendy Robin & Studio W**

15          Robin's struggles with the Board parallel Waugh's.  Robin has been a licensed

16   cosmetologist in Nevada since 2010.  In December 2010, she opened Studio W in Henderson,

17   Nevada to exclusively teach makeup artistry.

18          In February 2011, Inspector Green informed Robin that the Board had received an

19   anonymous tip that she was illegally teaching makeup artistry.  Shortly thereafter, Robin met with

20   the Inspectors (Green and Curtis) at the Board's office in Las Vegas.  The Inspectors told Robin

21   that she would have to either disable the Studio W website or completely change the website's

22   language.  The Board objected to the website's use of the words "classes" and "course" in the full

23   context in which they were used.

24

25

26

---

27          [1] (Compl. ¶ 78; Am. Answer ¶ 78.)

28          [2] (Compl. ¶ 84; Am. Answer ¶ 84.)

1    Robin has since closed Studio W and now teaches makeup artistry on a freelance basis.

2    However, she does not have an instructor's license and faces a fine of up to $2,000 every time she

3    teaches.

4    **C.      Facts Common to Both Plaintiffs**

5    The parties agree on these common facts related to cosmetology and makeup artistry

6    broadly, what the Board has demanded for compliance with the cosmetology statutes and

7    regulations, and the Board's present conduct with respect to Plaintiffs' activities.  Cosmetology

8    includes a broad range of specialty occupations focusing on hair care, skincare, and nail care.

9    Makeup artistry, on the other hand, is more limited; among other differences with cosmetology,

10   makeup artistry does not include hair cutting, hair coloring, hair styling, or hair removal.

11   To comply with the Board's interpretation of Nevada's cosmetology licensing scheme,

12   Waugh and Robin would have to obtain either a cosmetologist instructor license or an

13   aesthetician instructor license.  In addition, Waugh and Robin would have to convert their

14   makeup artistry schools into schools of cosmetology.  Cosmetology schools train students to work

15   as hair stylists, skincare specialists (aestheticians), and manicurists by teaching them how to treat

16   the hair, skin, and nails.  Cosmetology schools provide some instruction in makeup application.

17   But the mandatory curriculum for cosmetology and for aesthetics does not include instruction for

18   applying makeup with an airbrush, for special effects makeup, or for applying makeup for high-

19   definition film or television.  The state examinations to become a licensed cosmetologist and

20   licensed aesthetician test only the most basic makeup application techniques.  The state

21   examination to become a licensed instructor does not test makeup artistry or makeup artistry

22   instruction.  Finally, compliance would force Plaintiffs' schools to meet various structural and

23   equipment requirements, at significant costs.

24   The Board has closed its investigations of both schools because it believes LMI and

25   Studio W came into compliance by not operating as schools—i.e., not accepting fees to teach

26   makeup artistry.  The Board has not taken any disciplinary action against Waugh or Robin.

27   In June 2012, Plaintiffs filed suit against the Board under 42 U.S.C. § 1983, claiming violations

28   of the Due Process Clause of the Fourteenth Amendment, the Equal Protection Clause of the

Fourteenth Amendment, the Privileges or Immunities Clause of the Fourteenth Amendment, and the Free Speech Clause of the First Amendment.[3]  Both sides have moved for summary judgment.[4]

## II.   ANALYSIS

### A.  Legal Standard — Summary Judgment, Fed. R. Civ. P. 56

The Federal Rules of Civil Procedure provide for summary adjudication when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[5]  Material facts are those that may affect the outcome of the case.[6]  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.[7]  "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor."[8]  A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims."[9]

In determining summary judgment, courts apply a burden-shifting analysis.  "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.  In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case."[10]  In contrast, when the

---

[3] (Compl., Dkt. No. 1.)

[4] (Dkt. Nos. 27, 29.)

[5] Fed. R. Civ. P. 56(a).

[6] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[7] *See id.*

[8] *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008).

[9] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

[10] *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted).

nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial.[11]  If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence.[12]

If the moving party satisfies its initial burden, the burden then shifts to the opposing party to establish either that a genuine issue of material fact exists or that the moving party is not entitled to judgment as a matter of law.[13]  To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."[14]  In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data.[15]  Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts supported by competent evidence that shows a genuine issue for trial.[16]

At summary judgment, a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial.[17]  The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor."[18]  But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted.[19]

---

[11] *See Celotex*, 477 U.S. at 323–24.

[12] *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

[13] *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

[14] *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).

[15] *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

[16] *See Celotex*, 477 U.S. at 324.

[17] *See Anderson*, 477 U.S. at 249.

[18] *Id*. at 255.

[19] *See id.* at 249–50.

1    Finally, "[a] trial court can only consider admissible evidence in ruling on a motion for

2    summary judgment."[20]  As "authentication is a condition precedent to admissibility, . . .

3    unauthenticated documents cannot be considered in a motion for summary judgment."[21]

4    Because there are no genuine disputes of material fact in this case, a conclusion to which

5    both sides agree, I can order judgment as a matter of law.

6    **B.    Legal Standard — 42 U.S.C. § 1983**

7    42 U.S.C. § 1983 provides:

8    Every person who, under color of any statute, ordinance, regulation, custom, or
     usage, of any State or Territory or the District of Columbia, subjects, or causes to
9    be subjected, any citizen of the United States or other person within the
     jurisdiction thereof to the deprivation of any rights, privileges, or immunities
10   secured by the Constitution and laws, shall be liable to the party injured in an
     action at law, suit in equity, or other proper proceeding for redress. …
11

12   Section 1983 provides a mechanism for the private enforcement of substantive rights conferred by

13   the U.S. Constitution and federal statutes.[22]  Section 1983 "'is not itself a source of substantive

14   rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'"[23]  "To

15   state a claim under § 1983, a plaintiff must [1] allege the violation of a right secured by the

16   Constitution and laws of the United States, and must [2] show that the alleged deprivation was

17   committed by a person acting under color of state law."[24]

18   Neither side raised the issue of Eleventh Amendment immunity in the moving papers.  I

19   will address it, nonetheless.  For claims brought under § 1983, the Eleventh Amendment affords

20   immunity to the State of Nevada and to agencies of the State, such as the Nevada State Board of

21   Cosmetology.[25]  However, "Eleventh Amendment immunity is treated as an affirmative defense

22

23   [20] *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002).

24   [21] *Id.* (internal quotation marks and citation omitted).

25   [22] *Graham v. Connor*, 490 U.S. 386, 393–94 (1989).

     [23] *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3
26   (1979)).

27   [24] *West v. Atkins*, 487 U.S. 42, 48 (1988).

     [25] *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66–67 (1989); *Krainski v. Nev. ex. rel. Bd. of*
28   *Regents of Nev. Sys. of Higher Educ.*, 616 F.3d 963, 967–68 (9th Cir. 2010).

and can be expressly waived or forfeited if the State fails to assert it."[26]  "A state waives its Eleventh Amendment immunity if it unequivocally evidences its intention to subject itself to the jurisdiction of the federal court."[27]  In *Johnson*, the Ninth Circuit held that the defendant Community College District, an agency of the State of California, waived its Eleventh Amendment immunity by "engaging in extensive proceedings in the district court without seeking dismissal on sovereign immunity grounds."[28]  The defendant "litigated the suit on the merits, participated in discovery, and filed a motion to dismiss and a summary judgment motion without pressing a sovereign immunity defense," even though it "baldly asserted in its Answer" that it was immune under the Eleventh Amendment.[29]

Similarly, the Board asserted in its Answer that it is immune from suit under the Eleventh Amendment,[30] yet the Board did not move for dismissal on this basis, participated in discovery, moved for summary judgment without raising Eleventh Amendment immunity as a defense, and orally argued the motion without raising this defense.  In this circumstance, the Board unequivocally waived its Eleventh Amendment immunity as to this lawsuit.[31]  Accordingly, I may order judgment against the Board, including enjoining the Board and its agents and employees, from enforcing the cosmetology statutes and regulations.[32]

---

[26] *Jackson v. Abercrombie*, 884 F. Supp. 2d 1065, 1082 (D. Haw. 2012) (citing *ITSI T.V. Prods., Inc. v. Agric. Ass'ns*, 3 F.3d 1289, 1291 (9th Cir. 1993)).

[27] *Johnson v. Rancho Santiago Cmty. Coll. Dist.*, 623 F.3d 1011, 1021 (9th Cir. 2010) (internal quotation marks and citation omitted).

[28] *Id.* at 1022.

[29] *Id.*

[30] (Dkt. No. 12 at 12.)

[31] *See Johnson*, 623 F.3d at 1022.

[32] *Cf. 995 Fifth Ave. Assocs., L.P. v. N.Y. State Dep't of Taxation & Fin.*, 963 F.2d 503 (2d Cir. 1992) (affirming in part bankruptcy court's affirmative injunction against the State of New York to refund certain tax payments).

## C.      Article III Justiciability

The Board argues that Plaintiffs' claims are not justiciable under Article III of the U.S. Constitution, which "requires that [federal courts] decide only 'cases' or 'controversies.'"[33]  To determine if a case or controversy is of the "justiciable sort referred to in Article III,"[34] courts rely on the related doctrines of standing, ripeness, and mootness.[35]  "The party invoking federal jurisdiction has the burden of establishing" the justiciability of a matter.[36]

### 1.      Standing

To have standing, a plaintiff must show "(1) a concrete injury; (2) fairly traceable to the challenged action of the defendant; (3) that is likely to be redressed by a favorable decision."[37]

### a.      Injury-in-Fact

The injury must be actual or imminent, not conjectural or hypothetical.[38]  When challenging a statutory scheme, a plaintiff "must demonstrate a realistic danger of sustaining a direct injury as a result of a statute's operation or enforcement."[39]  However, "a plaintiff does not have to await the consummation of threatened injury to obtain preventive relief."[40]

> When the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he should not be required to await and undergo a . . . prosecution as the sole means of seeking relief." . . . But persons having no fears of state prosecution except those that are imaginary or speculative, are not to be accepted as appropriate plaintiffs.[41]

---

[33] *Culinary Workers Union, Local 226 v. Del Papa*, 200 F.3d 614, 617 (9th Cir. 1999); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

[34] *Lujan*, 504 U.S. at 560.

[35] *Culinary Workers Union*, 200 F.3d at 617.

[36] *Lujan*, 504 U.S. at 561.

[37] *Id.* at 560.

[38] *Id.*

[39] *Babbitt v. United Farm Workers*, 442 U.S. 289, 298 (1979).

[40] *Id.*

[41] *Id.*

1   Here, Plaintiffs do not just allege an intent to engage in prohibited conduct.  They are presently

2   doing so.  Waugh continues to operate LMI without a license, and Robin occasionally teaches

3   makeup artistry freelance.  The Board agrees that they face penalties up to a $2,000 fine for each

4   instance of unlicensed instruction.  That the Board is not presently investigating Plaintiffs and has

5   no present intention to do so are of no moment.  An anonymous complaint triggering an

6   investigation could arrive at any time.  The threat of a complaint is not just hypothetical, as the

7   Board received complaints about both Plaintiffs within months of the opening of their respective

8   makeup artistry schools.  In an analogous case, the Ninth Circuit determined that a purportedly

9   regulated party—the operator of a pest removal company—had standing "because he cannot

10  engage in his trade unless he first satisfies the current licensing requirement or receives an

11  exemption."[42]  Similarly, Waugh and Robin have standing.

**b.      Causation**

13  Plaintiffs' predicament stems directly from the Board's investigation of their schools, the

14  Board's interpretation of state cosmetology laws and regulations, and the Investigators'

15  conclusions that the schools were operating illegally.  The alleged injury is certainly traceable to

16  the Board's actions.

**c.      Redressability**

18  "A plaintiff meets the redressability requirement if it is likely, although not certain, that

19  his injury can be redressed by a favorable decision."[43]  More precisely, "[i]f a plaintiff is 'an

20  object of the [challenged action] . . . there is ordinarily little question that the action or inaction

21  has caused him injury, and that a judgment preventing or requiring the action will redress it.'"[44]

22  Here, the Board "ha[s] the power to discipline [Plaintiffs] and, if [the Board is] enjoined from

23  enforcing the challenged provisions, [Plaintiffs] will have obtained redress in the form of freedom

24  to engage in certain activities without fear of punishment."[45]  Those precise activities are teaching

---

[42] *See Merrifield v. Lockyer*, 547 F.3d 978, 980 n.1 (9th Cir. 2008).

[43] *Wolfson v. Brammer*, 616 F.3d 1045, 1056 (9th Cir. 2010).

[44] *Id.* (quoting *Lujan*, 504 U.S. at 561–62).

[45] *Id.*

1  makeup artistry without a cosmetology or aesthetics instructor's license and operating a makeup

2  artistry school that is not licensed as a cosmetology school.  Plaintiffs' claims are likely, if not

3  certain, to be redressed by a favorable decision.

4  Therefore, Plaintiffs have standing to bring their claims.

5  **2.   Ripeness**

6  "The ripeness doctrine is drawn both from Article III limitations on judicial power and

7  from prudential reasons for refusing to exercise jurisdiction."[46]  "The ripeness doctrine 'is

8  peculiarly a question of timing.'"[47]  It is "designed to separate matters that are premature for

9  review because the injury is speculative and may never occur from those cases that are

10  appropriate for federal court action."[48]  "'Through avoidance of premature adjudication,' the

11  ripeness doctrine prevents courts from becoming entangled in 'abstract disagreements.'"[49]

12  "Ripeness has both constitutional and prudential components. . . . The constitutional

13  component of ripeness overlaps with the 'injury in fact' analysis for Article III standing."[50]

14  Plaintiffs here have sufficiently demonstrated an injury-in-fact, as explained above.  The

15  constitutional component of ripeness is thus satisfied.

16  Courts weigh two considerations to evaluate the prudential component of ripeness: "the

17  fitness of the issues for judicial decision and the hardship to the parties of withholding court

18  consideration."[51]  "A claim is fit for decision if the issues raised are primarily legal, do not require

19  further factual development, and the challenged action is final."[52]  "To meet the hardship

20  requirement, a litigant must show that withholding review would result in direct and immediate

21

22  [46] *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (internal quotation
23  marks omitted).

[47] *Wolfson*, 616 F.3d at 1057 (quoting *Reg'l Rail Reorg. Act Cases*, 419 U.S. 102, 140 (1974)).

24  [48] *Id.* (internal quotation marks and citation omitted).

25  [49] *Id.* (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967), *abrogated on other grounds by*
26  *Califano v. Sanders*, 430 U.S. 99 (1977)).

[50] *Id.* at 1058.

27  [51] *Abbot Labs*, 387 U.S. at 149.

28  [52] *Wolfson*, 616 F.3d at 1060 (internal quotation marks and citation omitted).

1    hardship and would entail more than possible financial loss."[53]  More broadly, courts "consider

2    whether the regulation requires an immediate and significant change in plaintiffs' conduct of their

3    affairs with serious penalties attached to noncompliance."[54]

4           In this case, the issues are entirely legal, and there is no need for further factual

5    development.  Indeed, the parties intend the cross-motions for summary judgment to resolve the

6    claims as a matter of law.  Withholding review would maintain a precarious status quo for

7    Plaintiffs.  They would continue operating under a pall of likely future enforcement actions.  The

8    Board is aware of the existence and nature of their ongoing operations.  Although there is no

9    "final" Board action being challenged, the Board has apparently communicated to Plaintiffs that it

10   does not intend to modify its interpretation of the cosmetology statutes and regulations.  The

11   Board's position is thus sufficiently "final" for ripeness purposes.  Without review, Waugh's

12   school faces the constant threat of shutdown and Robin faces an uncertain professional existence

13   as an "illegal" freelance instructor.  Plaintiffs are in a bind: either expend considerable time and

14   resources to meet the current licensing regime or face serious financial penalties.  Plaintiffs'

15   claims are ripe.[55]

16          **3.      Mootness**

17          "Article III of the United States Constitution limits federal court jurisdiction to 'actual,

18   *ongoing* cases or controversies.'"[56]  Federal courts lack jurisdiction "to decide moot questions or

19   abstract propositions," because "moot questions require no answer."[57]  As such, "[a] case or

20   controversy must exist at all stages of review, not just at the time the action is filed. . . . A case

21

22

23   _____

24          [53] *Id.* (internal quotation marks and citation omitted).

25          [54] *Id.* (internal quotation marks and citation omitted).

         [55] *See id.*

26          [56] *Wolfson*, 616 F.3d at 1053 (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990))
     (emphasis added).

27          [57] *N.C. v. Rice*, 404 U.S. 244, 246 (1971) (per curiam) (internal quotation marks and citations

28   omitted).

1  may become moot after it is filed, when the issues presented are no longer 'live' or the parties

2  lack a legally cognizable interest in the outcome."[58]

3        Plaintiffs' claims are undoubtedly "live."  The conflict between Plaintiffs and the Board is

4  ongoing.  The Board's current inaction against Plaintiffs does not preclude review.  If it did, then

5  the Board could simply halt an investigation whenever sued over its imposition of the

6  cosmetology licensing scheme.[59]  Plaintiffs can reasonably expect to be investigated again and

7  face financial penalties.[60]  Finally, Plaintiffs certainly maintain a strong interest in the outcome of

8  the case, as their professional and financial futures seemingly depend in large part on it.

9        In summary, Plaintiffs satisfy the justiciability requirements of Article III.

10       **D.    *Burford* Abstention**

11       Relying on the abstention doctrine which the Supreme Court established in *Burford v. Sun*

12  *Oil*,[61] the Board argues that I should abstain from deciding this case because Plaintiffs seek

13  equitable relief and because "the State of Nevada has a strong interest in the application and

14  enforcement of its domestic policy and the protection of the health, safety, and welfare of its

15  citizens."[62]  Under the *Burford* doctrine,

16       Where timely and adequate state-court review is available, a federal court sitting in
         equity must decline to interfere with the proceedings or orders of state
17       administrative agencies: (1) when there are difficult questions of state law bearing
         on policy problems of substantial public import whose importance transcends the
18       result in the case then at bar; or (2) where the exercise of federal review of the
         question in a case and in similar cases would be disruptive of state efforts to
19       establish a coherent policy with respect to a matter of substantial public concern.[63]

20

21

22

_____

23       [58] *Wolfson*, 616 F.3d at 1053.

24       [59] *See id.* at 1053–54 (actions "capable of repetition, yet evading review" are excepted from the
    mootness doctrine).

25       [60] *See id* at 1054.

26       [61] 319 U.S. 315 (1943).

         [62] (Def.'s Mot. Summ. J. 11–12.)

27
         [63] *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 361 (1989)

28  (internal quotation marks and citation omitted).

1    Yet, "[w]hile *Burford* is concerned with protecting complex state administrative processes from

2    undue federal interference, it does not require abstention whenever there exists such a process, or

3    even in all cases where there is a potential for conflict with state regulatory law or policy."[64]

4          "[T]he power to dismiss under the *Burford* doctrine . . . derives from the discretion

5    historically enjoyed by courts of equity."[65]  And "the exercise of this discretion must reflect

6    principles of federalism and comity."[66]  Courts must consider "the federal interest in retaining

7    jurisdiction over the dispute and the competing concern for the 'independence of state action'" in

8    determining whether "the State's interests are paramount and that a dispute would be best

9    adjudicated in a state forum."[67]  Importantly, "[t]his balance only rarely favors abstention, and the

10   power to dismiss recognized in *Burford* represents an extraordinary and narrow exception to the

11   duty of the District Court to adjudicate a controversy properly before it."[68]

12         Here, there exists some possibility of conflict with state regulatory policy, but that conflict

13   would arise solely as a result of the regulatory scheme violating the federal constitution.

14   Plaintiffs' claims do not implicate any difficult questions of state law.  The State of Nevada has a

15   regulatory process to regulate cosmetology, but this case seems very unlikely to unduly interfere

16   with that process.  Plaintiffs do not mount a facial challenge to the entire regulatory scheme.

17   Rather, this is a relatively narrow, as-applied challenge.  Finally, while the State of Nevada has an

18   interest in regulating the field of cosmetology for the public welfare, this case also seems unlikely

19   to disrupt the State's efforts to establish a coherent policy for doing so.  In light of the Supreme

20   Court's instruction that *Burford* abstention is to be rarely invoked, I decline to invoke it.[69]

21

22

23

24         [64] *Id.* at 362 (internal quotation marks and citation omitted).

25         [65] *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 727 (1996).

26         [66] *Id.* (internal quotation marks and citation omitted).

           [67] *Id.* (quoting *Burford*, 319 U.S. at 334).

27         [68] *Id.* (internal quotation marks and citation omitted).

28         [69] *See id.*

### E.     First Amendment — Free Speech

I analyze the free speech issues first because their resolution determines the applicable standard of review—either rational basis or intermediate scrutiny.

#### 1.     Speech or Conduct?

The threshold issue is whether the Board purports to regulate conduct or speech, which in turn depends on whether teaching makeup artistry is expressive conduct (a form of speech, also called symbolic speech).[70]  "[W]ords can in some circumstances violate laws directed not against speech but against conduct. . . ."[71]  "The Supreme Court has made clear that First Amendment protection does not apply to conduct that is not 'inherently expressive.'"[72]

Under *Texas v. Johnson*, "[t]o constitute expressive conduct protected by the First Amendment, an act must be made with an 'intent to convey a particularized message,' and that message must be likely to 'be understood by those who viewed it.'"[73]  "The expression of an idea through activity" is protected speech.[74]  "[I]t is the obligation of the person desiring to engage in assertedly expressive *conduct* to demonstrate that the First Amendment even applies."[75]  Here, then, to establish that teaching makeup artistry is "speech," Plaintiffs must demonstrate that they intend to convey a particularized message through the teaching of makeup artistry that is likely to be understood by their students and by other viewers.

If Plaintiffs meet that burden, they will be subject to the State's cosmetology scheme only if the scheme meets the intermediate scrutiny standard set forth by the Supreme Court in *United*

---

[70] *See Pickup v. Brown*, 740 F.3d 1208, 1225 (9th Cir. 2013); *Nat'l Ass'n for Advancement of Psychoanalysis v. Cal. Bd. of Psychology ("NAAP")*, 228 F.3d 1043, 1053–54 (9th Cir. 2000).

[71] *R.A.V. v. City of St. Paul*, 505 U.S. 377, 389 (1992).

[72] *Pickup*, 740 F.3d at 1225 (quoting *Rumsfeld v. Forum for Academic & Institutional Rights, Inc. ("FAIR II")*, 547 U.S. 47, 62 (2006)).

[73] *Edwards v. Dist. of Columbia*, 943 F. Supp. 2d 109, 118 (D.D.C. 2013) (quoting *Texas v. Johnson*, 491 U.S. 397, 404 (1989)), *rev'd on other grounds*, Nos. 13-7063, 13-7064, __ F.3d __ (D.C. Cir. June 27, 2014).

[74] *Spence v. Wash.*, 418 U.S. 405, 411 (1974).

[75] *Clark*, 468 U.S. at 293 n.5 (emphasis added).

1    *States v. O'Brien*.[76]  Under *O'Brien*, a law regulating expressive conduct is valid only "[1] if it

2    furthers an important or substantial governmental interest; [2] if the governmental interest is

3    unrelated to the suppression of free expression [i.e., content-neutral]; and [3] if the incidental

4    restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance

5    of that interest."[77]  If a law is content-based, strict scrutiny applies.[78]

6           Plaintiffs rely on the Supreme Court's decision in *Holder v. Humanitarian Law Project*

7    ("*HLP*")[79] for the broad proposition that all teaching is expressive conduct.  As relevant here, the

8    issue in *HLP* was whether the application of a criminal statute which prohibits "knowingly

9    provid[ing] material support or resources to a foreign terrorist organization [FTO]" against

10   persons intending to support only the humanitarian and law-abiding activities of several FTOs

11   violated those persons' First Amendment right to free speech.[80]  Specifically, the plaintiffs

12   desired to (1) train FTO members how to use humanitarian and international law to peacefully

13   resolve disputes; and (2) teach FTO members how to petition various representative bodies such

14   as the United Nations for relief.[81]

15          The Court rejected the Government's proposition that the law regulated only conduct, and

16   likewise rejected the plaintiffs' argument that the teaching and training amounted to "pure

17   political speech."  The Court framed the issue as "whether the Government may prohibit what

18   plaintiffs want to do—provide material support to [FTOs] in the form of speech."[82]

19          The Court first addressed whether the plaintiffs' desired activity was conduct or speech

20   for purposes of First Amendment analysis.  The Court held that "material support" can take the

21   form of speech, although it usually does not, and that part of the plaintiffs' desired support

22

---

23          [76] 391 U.S. 367, 377 (1968).

24          [77] *Id.*

25          [78] *McCullen v. Coakley*, 134 S. Ct. 2518, 2530 (2014).

             [79] 130 S. Ct. 2705, 2723–24 (2010).

26          [80] *Id.* at 2722–23.

27          [81] *Id.* at 2716.

28          [82] *Id.* at 2724.

activities constituted speech.[83]  The Court analogized to *Cohen v. California*, in which it held that a law barring breaches of the peace was subject to heightened scrutiny when applied against a person wearing a jacket bearing an anti-war epithet ("Fuck the Draft").  In *Cohen*, the Court "recognized that the generally applicable law was directed at Cohen because of what his speech communicated [about the draft]—he violated the breach of the peace statute because of his particular message."[84]

Referring to the *Cohen* jacket-with-epithet, the Court in *HLP* reasoned that "this suit falls into the same category.  The law here may be described as directed at conduct, as the law in *Cohen* was directed at breaches of the peace, but as applied to plaintiffs the conduct triggering coverage under the statute consists of communicating a message."[85]  The Court applied strict scrutiny and upheld the criminal statute as applied to the plaintiffs' desired teaching and training activities.  The Court declined to apply the *O'Brien* intermediate scrutiny standard because the "material support" law, as applied to the plaintiffs, was content-based—i.e., related to the plaintiffs' communication of a particular message.[86]  However, the Court did not articulate what that message was.[87]

In *HLP*, the Court implicitly performed a two-step analysis.  First, it impliedly determined that the plaintiffs intended to communicate a particularized message through their teaching and training that would likely be understood by the message's viewers.  Thus, the plaintiffs' desired activities amounted to expressive conduct, implicating at least *O'Brien*'s intermediate scrutiny standard.  Second, the Court determined that the criminal statute targeted the plaintiffs based on the content of their message:

> Plaintiffs want to speak to the [FTOs], and whether they may do so under § 2339B depends on what they say.  If plaintiffs' speech to those groups imparts a "specific skill" or communicates advice derived from "specialized knowledge"—for

---

[83] *Id.* at 2723.

[84] *Humanitarian Law Project*, 130 S. Ct. at 2724.

[85] *Id.*

[86] *Id.* at 2723–24.

[87] *See id.* at 2724.

1
2
example training on the use of international law or advice on petitioning the
United States—then it is barred. . . . On the other hand, plaintiffs' speech is not
barred if it imparts only generalized or unspecialized knowledge.[88]

3
Therefore, the law was content-based and strict scrutiny applied.[89]

4
5
6
7
8
9
This analytical process is instructive, but *HLP* does not supply the answer in this case that
Plaintiffs assert it does.  *HLP* did not hold that all teaching and training is expressive conduct.[90]
To do so would seemingly circumvent the *Texas v. Johnson* analysis of whether a person intends
her conduct to communicate a particularized message, and *HLP* should not be read to overrule
*Johnson*.  Indeed, *HLP* cited *Johnson* as the appropriate test to determine whether conduct is
expressive.[91]

10
11
12
13
14
15
16
17
18
19
20
21
Similarly, I do not read *HLP* to hold that the mere communication of a message converts
conduct into protected speech.  In the colloquial sense, all speech communicates a message, just
as dictating a grocery list communicates what the person intends to purchase.  But not all verbal
communication is protected by the First Amendment, and not all conduct, even if verbal in part,
communicates a particularized message likely to be understood by its viewers and listeners.  "[I]t
has never been deemed an abridgment of freedom of speech . . . to make a course of conduct
illegal merely because the conduct was in part initiated, evidenced, or carried out by means of
language, either spoken, written, or printed."[92]  Likewise, "[t]he Supreme Court has noted that
'[w]hile it is possible to find some kernel of expression in almost every activity a person
undertakes . . . such a kernel is not sufficient to bring the activity within the protection of the First
Amendment.'"[93]  "If combining speech and conduct were enough to create expressive conduct, a
regulated party could always transform conduct into 'speech' by simply talking about it."[94]

22
23
24
25
26
27
28

_____

[88] *Id.*

[89] *Id.*

[90] *See id.* at 2729.

[91] *See id.* at 2723–24.

[92] *Tenn. Secondary Sch. Athletic Ass'n v. Brentwood Acad.*, 551 U.S. 291, 297 (2007) (internal quotation marks and citation omitted).

[93] *NAAP*, 228 F.3d at 1054 (quoting *City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989)).

[94] *FAIR II*, 547 U.S. at 1311.

1   Likewise, "an act that 'symbolizes nothing,' even if employing language, is not 'an act of

2   communication' that transforms conduct into First Amendment speech."[95]

3          Moreover, the relevance of *HLP* to the instant case is questionable.  In *Pickup v. Brown*—

4   the recent Ninth Circuit decision upholding a California law which prohibits licensed

5   professionals from practicing sexual orientation change efforts ("SOCE") on minors—the court

6   distinguished *HLP* as "pertain[ing] to a different issue entirely: the regulation of (1) political

7   speech (2) by ordinary citizens."[96]  Plaintiffs do not assert that teaching makeup artistry has any

8   political speech components, and Plaintiffs themselves assert that they are acting in a professional

9   capacity when teaching.  *Pickup* reinforces that the proper question is whether teaching makeup

10  artistry is expressive conduct, in accord with the Supreme Court's analysis in *FAIR II*, which in

11  turn relied on *Johnson*'s expressive conduct standard.[97]

12         Examples of expressive conduct include (i) overnight camping in connection with a

13  demonstration;[98] (ii) burning an American flag as part of a political demonstration;[99] (iii) wearing

14  a black armband on a school campus (during the Vietnam War );[100] (iv) taping a peace sign to a

15  flag (also during the Vietnam war); and (v) a sit-in by African-American students in a "whites

16  only" library to protest segregation.[101]  More broadly, expressive conduct includes "the use of

17  funds to support a political candidate, the display of a flag or signs and banners, or a mode of

18  dress or personal grooming such as wearing a beard or a certain hair style; or by mere silent and

19  reproachful presence in a public place."[102]

20

21

---

22         [95] *Pickup*, 740 F.3d at 1220 (quoting *Nev. Comm'n on Ethics v. Carrigan*, 131 S. Ct. 2343, 2350
    (2011)).

23         [96] *Id.* at 1230.

24         [97] *See id.*; *FAIR II*, 547 U.S. at 65–66.

25         [98] *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984).

        [99] *Johnson*, 491 U.S. at 405–06.
26
        [100] *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969).
27
        [101] *Brown v. Louisiana*, 383 U.S. 131 (1966).

28         [102] 16A AM. JUR. 2d *Constitutional Law* § 528 (2d ed. 2014).

On the other hand, courts have held that the act of tattooing is non-expressive,[103] as is a Ku Klux Klan member's wearing of a white mask because the purported message was not sufficiently particularized.[104]  In the commercial context,

> [n]umerous examples could be cited of communications that are regulated without offending the First Amendment, such as the exchange of information about securities, . . . corporate proxy statements, . . . the exchange of price and production information among competitors, . . . and employers' threats of retaliation for the labor activities of employees.[105]

In *NAAP*, a membership association of professional psychoanalysts argued, among other things, that the State's application of psychology licensing laws to psychoanalysts violated its members' First Amendment right to free speech.[106]  The court impliedly determined that the licensing scheme did not sufficiently implicate speech to trigger *O'Brien*'s heightened analysis.[107]  The Ninth Circuit reasoned: "the key component of psychoanalysis is the treatment of emotional suffering and depression, not speech. . . . That psychoanalysts employ speech to treat their clients does not entitle them, or their profession, to special First Amendment protection."[108]  The court determined next that the licensing scheme was content- and viewpoint-neutral, as it was not applied to psychoanalysts "because of any disagreement with psychoanalytical theories."[109]  Accordingly, heightened scrutiny did not apply.  The court held that "[a]lthough some speech interest may be implicated, . . . [the] licensing scheme is a valid exercise of [the State's] police power to protect the health and safety of its citizens and does not offend the First Amendment."[110]

The Ninth Circuit continued this line of reasoning in *Pickup*, holding that performing SOCE on minors is conduct "that is not inherently expressive."[111]  "The First Amendment does

---

[103] *Hold Fast Tattoo, LLC v. City of N. Chicago*, 580 F. Supp. 2d 656, 660 (N.D. Ill. 2008).

[104] *Church of the Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197 (2d. Cir. 2004).

[105] *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978).

[106] 228 F.3d 1043.

[107] *See id.* at 1054–55.

[108] *Id.* (internal quotation marks and citation omitted).

[109] *Id.* at 1056.

[110] *Id.*

[111] *Pickup*, 740 F.3d at 1230.

1    not prevent a state from regulating treatment even when that treatment is performed through

2    speech alone."[112]  "[C]ontent- or viewpoint-based regulation of communication *about* treatment

3    must be closely scrutinized.  But a regulation of only *treatment itself*—whether physical medicine

4    or mental health treatment—implicates free speech interests only incidentally, if at all."[113]

5    "Because [the California statute] regulates only treatment, while leaving mental health providers

6    free to discuss and recommend, or recommend against, SOCE, we conclude that any effect it may

7    have on free speech interests is merely incidental."[114]   Accordingly, the court applied rational

8    basis review to the California statute.

9           So, because teaching is not expressive conduct per se, the relevant question in this case is

10   whether Plaintiffs have carried their burden as to whether they intend to communicate a

11   particularized message through the teaching of makeup artistry that is likely to be understood by

12   their students and by other viewers.  The answer is no.

13          At oral argument, Plaintiffs confirmed that they are very passionate about teaching

14   makeup artistry.  The particularized message about which they are passionate is unclear, however.

15   Plaintiffs' moving papers focus on the legal arguments that teaching is protected speech under the

16   First Amendment and that the instructor licensing requirement is content-based.[115]  Passion alone

17   is insufficient.  In *FAIR II*, the Supreme Court held that a law school's conduct in disallowing

18   equal access to military recruiters was not inherently expressive, yet the law school strongly

19   objected to the recruiters' presence because of the military's treatment of homosexuals.[116]

20          I hold that teaching makeup artistry is non-expressive conduct.  Plaintiffs define makeup

21   artistry as "the professional application of stylized makeup for film, television, print photography,

22   and advertising."[117]  Teaching makeup artistry involves demonstrating and explaining how to

23   _____

24          [112] *Id.*

25          [113] *Id.* at 1231 (emphasis in original).

         [114] *Id.*
26
         [115] (*See* Pls.' Mot. Summ. J. 26–30.)

27          [116] 547 U.S. at 52.

28          [117] (Pls' Mot. Summ. J. 6.)

1    apply makeup for these settings.  As makeup artistry is an artistic, hands-on trade, teaching

2    makeup artistry presumably emphasizes hands-on instruction.  The words spoken during this

3    instruction seem non-expressive, especially in the absence of any argument by Plaintiffs as to any

4    particularized messages they intend to communicate while teaching (aside from how to apply

5    stylized makeup).  Just as the act of tattooing is non-expressive, the act of applying makeup is

6    non-expressive.[118]  And there is nothing to indicate that teaching how to perform the act of

7    applying makeup—even if that teaching involves verbal communication as to makeup theory in

8    general or specific methodologies—is intended to communicate a particular message beyond how

9    to perform the task at issue.

10           In addition, teaching makeup artistry is distinguishable from two recent cases which held

11   that giving guided city tours contains speech components.  In *Edwards v. District of Columbia*,

12   the United States District Court for the District of Columbia analyzed whether a licensing scheme

13   for sightseeing tour guides violated the free speech rights of the tour guides.[119]  The court

14   determined that some tour functions, such as guiding and directing tour participants from place to

15   place, are not expressive.[120]  However, the court determined that "the act of serving as a paid tour

16   guide involves both nonspeech and speech elements."[121]  The conduct of "communicat[ing]

17   information and opinions about places of interest in Washington D.C." is expressive.[122]  Although

18   the D.C. Circuit reversed, it did not disagree with the district court's determination that paid tour

19   guides engage in expressive conduct.[123]  The Eastern District of Louisiana recently came to

20   essentially the same conclusion in an analogous tour guide case—that tour guides' conduct is

21   expressive, at least in part.[124]  The facts of *Edwards* and *Kagan* are easily distinguishable from

22   _____

23        [118] *See Hold Fast Tattoo*, 580 F. Supp. 2d at 660.

         [119] 943 F. Supp. 2d 109.

24        [120] *Id.* at 118.

25        [121] *Id.*

26        [122] *Id.*

27        [123] *See Edwards*, 2014 WL 2895938 at *3 (applying the *O'Brien* intermediate scrutiny test).

         [124] *See Kagan v. City of New Orleans*, 957 F. Supp. 2d 774 (E.D. La. 2013), *aff'd*, No. 13-30801,
28   __ F.3d __ (5th Cir. June 2, 2014).

the instant case, however, as providing personal opinions about places of historical and public interest in the capital city and in New Orleans is a far cry from explaining how to apply makeup for film, television, and photography shoots.

Plaintiffs also argue that teaching is "pure speech" under the First Amendment, and that academic freedom is of special concern under the First Amendment. Plaintiffs' academic freedom argument is irrelevant, however, because teaching makeup artistry is non-expressive conduct. In addition, the cases Plaintiffs cite are largely inapposite. Several deal with government interference with academics during the Cold War for political purposes,[125] and two of them are non-binding opinions from other circuits.[126] More importantly, Plaintiffs provide no support for the notion that "academic freedom" provides blanket, wholesale protection to private occupational instructors. On the contrary, "[a]s a cultural and legal principle, academic freedom 'was conceived and implemented in the university' out of concern for 'teachers who are also researchers or scholars.'"[127]

In short, Plaintiffs have not carried their burden of establishing that teaching makeup artistry is expressive conduct. To the extent the instructor's licensing requirement infringes on Plaintiffs' right to free speech, that infringement is "merely incidental" to the generally-applicable regulations that govern the conduct of teaching makeup artistry.[128] "'A statute that governs the practice of an occupation is not unconstitutional as an abridgement of the right to free speech, so long as any inhibition of that right is merely the incidental effect of observing an otherwise legitimate regulation.'"[129] Similarly, "[i]f the government enacts generally applicable licensing

---

[125] *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589 (1967); *Barenblatt v. U.S.*, 360 U.S. 109 (1959); *Sweezy v. State of N.H. by Wyman*, 354 U.S. 234 (1957).

[126] *Goulart v. Meadows*, 345 F.3d 239, 248 (4th Cir. 2003); *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 446 (2d Cir. 2001).

[127] *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Village Sch. Dist.*, 624 F.3d 332, 343–44 (6th Cir. 2010) (quoting J. Peter Byrne, *Academic Freedom: A "Special Concern of the First Amendment"*, 99 YALE L.J. 251, 288 n.137 (1989)).

[128] *Pickup*, 740 F.3d at 1231.

[129] *Locke v. Shore*, 634 F.3d 1185, 1191 (11th Cir. 2011) (quoting *Accountant's Soc. of Va. v. Bowman*, 860 F.2d 602, 604 (4th Cir. 1988)).

provisions limiting the class of persons who may practice the profession, it cannot be said to have enacted a limitation on the freedom of speech . . . subject to First Amendment scrutiny."[130] Rational basis is thus the proper standard of review.[131]  Because rational basis is also the appropriate standard of review for the Equal Protection and Due Process analyses, I need not separately assess the challenged regulations under the First Amendment.  Nonetheless, I briefly address the parties' other speech-related arguments.

### 2.    Commercial Speech

Even if teaching makeup artistry constitutes protected speech, it would not be commercial speech.  "Commercial speech enjoys a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values, and is subject to modes of regulation that might be impermissible in the realm of noncommercial expression."[132]  To determine whether Plaintiffs' teaching constitutes commercial speech, I follow the Supreme Court's guidance in *Bolger v. Youngs Drug Products Corporation*.[133]  "Where the facts present a close question, 'strong support' that the speech should be characterized as commercial speech is found where the speech is an advertisement, refers to a particular product, and the speaker has an economic motivation."[134]  "[T]he 'core notion of commercial speech' is that it 'does no more than propose a commercial transaction.'" *Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180, 1184 (9th Cir. 2001) (quoting *Bolger*, 463 U.S. at 66).  In the seminal *Central Hudson* case, the Supreme Court defined commercial speech as "expression related solely to the economic interests of the speaker and its audience."[135]

---

[130] *Lowe v. SEC*, 472 U.S. 181, 232 (1985) (White, J., concurring).

[131] *Pickup*, 740 F.3d at 1231.

[132] *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 623 (1995) (internal quotation marks and alterations omitted).

[133] 463 U.S. 60 (1983); *see Charles v. City of Los Angeles*, 697 F.3d 1146, 1151 (9th Cir. 2012).

[134] *Hunt v. City of Los Angeles*, 638 F.3d 703, 715 (9th Cir. 2011).

[135] *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980).

1   The teaching of makeup artistry itself is not an advertisement, nor does it propose a

2   commercial transaction.  The students have already agreed to attend Plaintiffs' schools by the

3   time the teaching occurs.  The teaching certainly does more than propose a commercial

4   transaction, and the students' interest is arguably greater than their own economic interests.

5   Learning and practicing a new profession can reasonably be expected to improve one's "sense of

6   dignity, self-worth, and confidence," values which exist wholly apart from a paycheck.[136]

7   Teaching makeup artistry, in the context of this case, is not commercial speech.

### 3.    Content-Based or Content-Neutral?

9   Even if teaching makeup artistry constitutes protected speech, the restrictions at issue are

10  not content-based.  Content-based restrictions on speech are presumptively invalid and must meet

11  strict scrutiny.[137]  The Supreme Court has explained:

> The principal inquiry in determining content neutrality . . . is whether the
> government has adopted a regulation of speech because of disagreement with the
> message it conveys. . . .  The government's purpose is the controlling
> consideration.  A regulation that serves purposes unrelated to the content of
> expression is deemed neutral, even if it has an incidental effect on some speakers
> or messages but not others. . . . Government regulation of expressive activity is
> content neutral so long as it is *justified* without reference to the content of the
> regulated speech.[138]

17  "As a general rule, laws that by their terms distinguish favored speech from disfavored speech on

18  the basis of the ideas or views expressed are content based."[139]  An "ordinance is content-based if

19  either the main purpose in enacting it was to suppress or exalt speech of a certain content, or it

20  differentiates based on the content of speech on its face."[140]

21  Plaintiffs contend that the Board's instructor licensing requirement is content-based

22  because "[i]f plaintiffs taught any other subject—math, art, photography, [etc.]—the government

23

24      [136] *N.Y. State Dep't of Soc. Servs. v. Dublino*, 413 U.S. 405, 409 (1973); *see Higdon v. U.S.* , 627
25  F.2d 893, 899–900 (9th Cir. 1980).

26      [137] *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358 (2009).

        [138] *Ward*, 491 U.S. at 791 (internal quotation marks and citations omitted) (emphasis in original).

27      [139] *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 643 (1994).

28      [140] *A.C.L.U. of Nev. v. City of Las Vegas*, 466 F.3d 784, 793 (9th Cir. 2006).

1   would not require Plaintiffs to first obtain a license."[141]  Therefore, Plaintiffs argue, the licensing

2   requirement targets the content of their speech: instruction about makeup artistry.  This argument

3   has several flaws.

4           First, Plaintiffs' argument is overly broad in that it ignores the fact that licenses are

5   properly required for many professions outside of teaching cosmetology, including primary

6   school teaching.[142]  The Board does not have the burden of demonstrating like regulations across

7   similar professions.[143]  Moreover, Plaintiffs do not argue that the Board disagrees with the

8   messages conveyed by makeup artistry instructors.  The Board's apparent purpose is only to

9   prevent those messages from being transmitted by an unlicensed person for pay.  This of course

10  limits the amount of speech that Plaintiffs can engage in, and the amount of speech that recipients

11  can hear.  However, the Board's actions are not directed toward regulating speech or its

12  content.[144]  The limitations on speech are incidental to the Board's avowed primary purpose:

13  protecting the health and safety of consumers, students, and the public.  Even if teaching makeup

14  artistry contains speech components, the Board is not motivated by limiting those components.

15  Therefore, the State's cosmetology scheme, as applied to Plaintiffs, is content-neutral.[145]

16          **F.      Fourteenth Amendment — Substantive Due Process**

17                  **1.      Legal Standard**

18          The substantive component of the Due Process Clause forbids the government
            from depriving a person of life, liberty, or property in such a way that . . .
19          interferes with rights implicit in the concept of ordered liberty. . . . A threshold
            requirement to a substantive . . . due process claim is the plaintiff's showing of a
20          liberty or property interest protected by the Constitution.[146]

21

22  _____

23      [141] (Pls.' Mot. Summ. J. 29.)

        [142] *See, e.g.*, NRS § 391.031 (licenses for teachers and educational personnel).

24      [143] *See Kagan*, 957 F. Supp. 2d at 784.

25      [144] *See Edwards*, 943 F. Supp. 2d at 120.

26      [145] Plaintiffs argue that the Supreme Court recently "clarified the standard for determining whether
    a regulation of speech is content based" in *McCullen v. Coakley*, 134 S. Ct. 2518.  (Dkt. No. 44 at 1–2.)  I
    disagree, as the Court still relied upon the standard enunciated in *Ward*. 134 S.Ct. at 2531.

27
        [146] *Engquist v. Or. Dep't of Agric.*, 478 F.3d 985, 996–97 (9th Cir. 2007), *aff'd*, 553 U.S. 591
28  (2008) (internal quotation marks and citations omitted).

Individuals have a "liberty interest in pursuing an occupation of [their] choice."[147]  "[A] plaintiff can make out a substantive due process claim if she is unable to pursue an occupation and this inability is caused by government actions that were arbitrary and lacking a rational basis."[148]

"Under rational basis review, a statute will pass constitutional muster if it is 'rationally related to a legitimate state interest.'"[149]  "The burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it."[150]  "Only a handful of provisions have been invalidated for failing rational basis review."[151]  In the blunt words of the Sixth Circuit, "the force of a five-week-old, unrefrigerated dead fish" is "a level of pungence *almost* required to invalidate a statute under rational basis review."[152]

I cannot "overturn a statute on the basis that no empirical evidence supports the assumptions underlying the legislative choice."[153]  Instead, "those challenging the legislative judgment must convince the court that the legislative facts on which the [statutory scheme] is apparently based could not reasonably be conceived to be true by the governmental decisionmaker."[154]  As the Supreme Court explained in the landmark *Carolene Products* case:

> The existence of facts supporting the legislative judgment is to be presumed, unless in the light of the facts made known or generally assumed it is of such a character as to preclude the assumption that it rests upon some rational basis within the knowledge and experience of the legislators.[155]

---

[147] *Id.* at 997.

[148] *Id.*

[149] *Merrifield*, 547 F.3d at 984 n.9 (quoting *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976)).

[150] *Armour v. City of Indianapolis, Ind.*, 132 S. Ct. 2073, 2080–81 (2012) (internal quotation marks and citation omitted).

[151] *Craigmiles v. Giles*, 312 F.3d 220, 225 (6th Cir. 2002).

[152] *Id.* at 225 (internal quotation marks and citation omitted) (emphasis added).

[153] *Powers v. Harris*, 379 F.3d 1208, 1217 (10th Cir. 2004).

[154] *Vance v. Bradley*, 440 U.S. 93, 111 (1979).

[155] *U.S. v. Carolene Prods. Co.*, 304 U.S. 144, 152 (1938).

1   I am "obliged to consider every plausible legitimate state interest that might support the [statutory

2   scheme for cosmetology, as applied to makeup artistry instruction]—not just the . . . interest[s]

3   forwarded by the parties."[156]

4   "'A State can require high standards of qualification, such as good moral character or

5   proficiency . . . before it admits an applicant . . . , but any qualification must have a rational

6   connection with the applicant's fitness or capacity to practice [the profession].'"[157]  Here, the

7   relevant profession is makeup artistry instruction.

### 2. The Cosmetology Licensing Scheme

9   Plaintiffs challenge the requirements that (a) their schools comply with the statutes and

10  regulations for "schools of cosmetology," and (b) they be licensed instructors.  Although the

11  requirements overlap to some degree, I take each in turn.

### a. Schools of Cosmetology

13  Under the cosmetology statute, "[a]ny person desiring to conduct a school of cosmetology

14  in which any one or any combination of the occupations of cosmetology are taught must apply to

15  the Board for a license . . . ."[158]  The regulations define a "school of cosmetology" as "a licensed

16  establishment accepting compensation for instruction in cosmetology."[159]  The occupations of

17  cosmetology are "cosmetologist, aesthetician, electrologist, hair designer, hair braider,

18  demonstrator of cosmetics and nail technologist."[160]  Therefore, anyone who operates a school at

19  which at least one of these occupations is taught for a fee must obtain a license from the Board.

20  A school so licensed is a "school of cosmetology" and must comply with myriad statutory and

21  regulatory requirements.

---

[156] *Powers*, 379 F.3d at 1218.

[157] *Merrifield*, 547 F.3d at 986 (quoting *Schware v. Bd. of Bar Exam. of State of N.M.*, 353 U.S. 232, 239 (1957) (discussing state requirements to practice law)).

[158] NRS § 644.380(1).

[159] NAC § 644.025.

[160] NRS § 644.024.

The first question here is whether makeup artistry falls within one of the seven enumerated occupations of cosmetology.  It does, as both cosmetologists and aestheticians are defined, in part, to include the practice of applying cosmetics.[161]  More specifically, a cosmetologist is "a person who engages in the practices of . . . [g]iving facials or skin care or applying *cosmetics* or eyelashes to any person."[162]  Similarly, as to cosmetics, an aesthetician is "any person who engages in the practices of . . . [b]eautifying, massaging, cleansing or stimulating the skin of the human body by the use of *cosmetic preparations* . . . for the care of skin . . . [and] [a]pplying *cosmetics* or eyelashes to any person, tinting eyelashes and eyebrows, and lightening hair on the body . . . , but does not include the branches of cosmetology of a cosmetologist, hair designer, hair braider, electrologist or nail technologist."[163]

The cosmetology statute does not define the term "cosmetic," but the regulations refer to the federal Food and Drug Administration's (the "FDA") determinations for cosmetic products that contain hazardous substances.[164]  I thus turn to the statute which gives authority to the FDA—the Federal Food, Drug, and Cosmetic Act of 1938 (the "FFDCA")[165]—for the relevant definition.

> The term "cosmetic" means (1) articles intended to be rubbed, poured, sprinkled, or sprayed on, introduced into, or otherwise applied to the human body or any part thereof for cleansing, beautifying, promoting attractiveness, or altering the appearance; and (2) articles intended for use as a component of any such articles; except that term shall not include soap.[166]

Makeup artists' essential task is applying cosmetics, as there can be little doubt that they rub, pour, sprinkle, and spray articles (make-up) onto the human body (generally, the face) to beautify, promote attractiveness, and alter the recipient's appearance.  By defining both cosmetologists and aestheticians as persons who "apply[] cosmetics . . . to any person," the

---

[161] NRS §§ 644.0205(1)(a), (b), 644.023(1)(a), (f), (g).

[162] NRS § 644.023(1)(g) (emphasis added).

[163] NRS § 644.0205(1) (emphasis added).

[164] NAC § 644.372(1).

[165] 21 U.S.C. §§ 301–399f.

[166] *Id.* § 321(i).

1  Nevada Legislature apparently intended to subject makeup artists to the Board's jurisdiction. [167]

2  Aestheticians also tint eyelashes and eyebrows, and lighten hair on the body (including the face),

3  all of which seem to fit within a makeup artists' scope of work.[168] Moreover, the regulations

4  define "make-up" as "any pigment product with is used to cover, camouflage or decorate facial

5  skin."[169]

6      Makeup artistry thus fits within two occupations of cosmetology: cosmetologist and

7  aesthetician.  Consequently, a school that teaches makeup artistry must be licensed by the Board

8  and must comply with the requirements that apply to schools of cosmetology.[170]

9      Plaintiffs contend, however, that "makeup artistry and cosmetology are fundamentally

10  different occupations."[171]  In the Complaint, Plaintiffs define makeup artistry as "the professional

11  application of stylized makeup for film, television, print photography and advertising," and

12  cosmetology as "involv[ing] ordinary beauty services like haircuts, facials, and hair

13  coloring . . . ."[172]  Plaintiffs, however, mischaracterize cosmetology, which, as noted above,

14  includes a broad range of occupations—two of which specifically include the application of

15  cosmetics.

16      At oral argument, Plaintiffs admitted that their definition of makeup artistry intends to

17  match the statutory exceptions that allow cosmetologists in certain limited circumstances to

18  practice without a license.  A license is not required if cosmetological services are "rendered in

19  connection with photographic services provided by a photographer."[173]  Similarly,

20      [a] person employed to render cosmetological services in the course of and

21

22  _____

    [167] NRS §§ 644.0205(1)(b); 644.023(1)(g).  *See Cornwell v. Hamilton*, 80 F. Supp. 2d 1101, 1103,
23  n.5 (S.D. Cal. 1999) (holding that California's Barbering and Cosmetology Act covered African
    hairbraiding because hairbraiders, "at minimum, arrange, beautify, or otherwise treat by any means hair."
    (citing CAL. BUS. & PROF. CODE § 7316(b)(1))).

24  [168] NRS § 644.0205(1)(b).

25  [169] NAC § 644.021.

26  [170] *See* NRS § 644.380(1); NAC § 644.025.

    [171] (Pls.' Mot. Summ. J. 6.)
27
    [172] (*Id.*)

28  [173] NRS § 644.190(3)(d).

1
2

incidental to the production of a motion picture, television program, commercial or advertisement is *exempt* from the licensing requirements of this chapter if he or she renders cosmetological services only to persons who will appear in that motion picture, television program, commercial or advertisement.[174]

3   Also, retail cosmetic demonstrators are exempt if the demonstration is without charge and "the

4   retailer does not advertise or provide a cosmetological service except cosmetics and

5   fragrances."[175]  Finally, photographers and their employees who provide cosmetics without

6   charge as part of their "ordinary vocation and profession" are exempt if they do not advertise

7   cosmetological services.[176]

8          Plaintiffs rely on these exceptions and on Plaintiffs' narrow definition of makeup artistry

9   to contend that practicing makeup artists are wholly exempt from the State's cosmetology

10  licensing scheme.  However, Plaintiffs' own explanations of the work they and their students

11  perform indicate that Plaintiffs' proffered definition of "makeup artist" does not so neatly match

12  the scope of the exceptions.  Waugh and Robin both explain that makeup artists may work in

13  retail and in fashion, preparing models for the runway.[177]  Waugh explains that makeup artists

14  prepare Cirque de Soleil performers for theatrical shows.[178]  Theatrical performances, retail work

15  outside of cosmetic counter demonstrations, and runway modeling are not covered by the

16  licensing exceptions.  Therefore, at least part of what practicing makeup artists do requires a

17  cosmetologist license or an aesthetician license.  This is not just an abstract reality; Plaintiffs

18  admit they teach students to perform makeup artistry in contexts outside of the statutory

19  exceptions.  Plaintiffs' assertion that practicing makeup artists are outside of the Board's

20  jurisdiction is incorrect.

21         Moreover, even if Plaintiffs taught only those skills that matched precisely with the

22  statutory licensing exceptions, makeup artistry would still fall within the occupations of

23  cosmetologist and aesthetician.  The exceptions do not alter the scope of work of cosmetologists

24

25  [174] NRS § 644.190(4) (emphasis added).

26  [175] NRS § 644.460(1)(d).

    [176] NRS § 644.460(1)(e).

27  [177] (Dkt. No. 27-1 at 5; Dkt. No. 27-2 at 6.)

28  [178] (Dkt. No. 27-1 at 5.)

1   or aestheticians.  For example, the exceptions do not state that applying cosmetics on a stage actor

2   is within the occupation of aesthetician while applying cosmetics to a television actor is without.

3   The exceptions provide scenarios in which a license is not required to provide cosmetological

4   services; the exceptions do not alter the definition of those services or the definition of the

5   occupations that provide the services.  Regardless of when a cosmetologist needs a license to

6   practice her services, the occupation of cosmetologist includes the application of cosmetics.  The

7   same is true for aestheticians.

8          In sum, makeup artistry falls within the occupations of cosmetologist and aesthetician, and

9   therefore may be taught only at a school of cosmetology.  This is not to say that the Legislature

10  was wise in structuring cosmetology and aesthetics to encompass makeup artistry, but the

11  statutory scheme nonetheless imposes certain requirements on makeup artistry schools as they are

12  schools of cosmetology.  The relevant question is whether the State has a legitimate interest in

13  regulating makeup artistry, and whether these requirements are rationally related to that interest.

14                          **b.          Legitimate State Interests**

15         Plaintiffs challenge the legitimacy of the State's purported health and safety interest, as

16  applied to makeup artistry instructors, by pointing out the gaping exceptions that allow practice

17  without a license.  If the State believes it is safe to apply makeup on television and film sets, and

18  on advertising and photography shoots, then the State cannot now point to the dangers of *teaching*

19  people to apply makeup in those same contexts.  However, the State need not regulate on an all-

20  or-nothing basis; it can choose which "evils" to regulate.[179]  Also, as noted above, Plaintiffs admit

21  that makeup artistry is performed in some circumstances that require a cosmetologist or

22  aesthetician license.  Plaintiffs' essential argument—that if practicing makeup artistry is exempt

23  from licensure then teaching makeup artistry should also be exempt—is fundamentally flawed

24  because practicing makeup artistry is not always exempt from licensure.

25

26

27          [179] *See Silver v. Silver*, 280 U.S. 117, 123 (1929); *Carr v. U.S.*, 422 F.2d 1007, 1012 (4th Cir.

28  1970).

1    Moreover, *teaching* makeup artistry and *practicing* makeup artistry—even in exempt

2    circumstances—are sufficiently different that the Legislature could have reasonably chosen to

3    regulate one and not the other.  Practicing makeup artistry in exempt areas involves applying

4    makeup to professionals who are generally accustomed to being made up.  Teaching makeup

5    artistry involves applying (and teaching) makeup to novices and to the general public.  More to

6    the point, teaching makeup artistry also involves the act of teaching, which practicing does not.

7    The health and safety concerns of teaching may be different than the health and safety concerns

8    of practicing, and that decision is the Legislature's to make.

9    Furthermore, the Legislature indicated its belief that at least some aspects of teaching

10    cosmetology present risks of disease transmission.  The statute grants the Board power to

11    promulgate "regulations governing sanitary conditions as it deems necessary with particular

12    reference to the precautions to be employed to prevent the creating or spreading of infectious or

13    contagious diseases . . . in schools of cosmetology," and these regulations cannot be adopted until

14    they are approved by the State Board of Health.[180]  A copy of these regulations must be provided

15    to each person who obtains a license to operate a school of cosmetology.[181]

16    That the Board has failed to provide any empirical evidence to support the Legislature's

17    apparent belief that disease creation and transmission can occur in schools of cosmetology is of

18    no import.  The evidentiary burden is not on the Board under rational basis review.[182]  The Board

19    submitted webpage printouts that explain the health dangers of cosmetics and a report from an

20    unknown source that explains the health concerns supporting the regulation of cosmetology.[183]

21    These exhibits are not authenticated, however, and thus I must disregard them.[184]  Nonetheless,

22    Plaintiffs have not "negate[d] every conceivable basis which might support" the cosmetology

23

24    _____

    [180] NRS § 644.120(1), (2).

25    [181] NRS § 644.120(3).

26    [182] *See Powers*, 379 F.3d at 1217.

    [183] (Dkt. Nos. 34–35.)

27    [184] *See Randazza v. Cox*, No. 2:12-cv-02040-JAD-PAL, 2014 WL 1407378 at *1 (D. Nev. Apr. 10,

28    2014).

1  scheme.[185]  The Legislature conceivably could have believed that the application of cosmetics to

2  the skin, and teaching people how to apply cosmetics to the skin, poses a health and safety risk to

3  those involved.  The Legislature also conceivably could have believed that prospective students

4  should be protected from unconscionable agreements, from schools that provide insufficient

5  instruction, and from schools that exploit students to provide cheap services to the public.

6  Several sections of the statute reflect the Legislature's attempt to curb these possible abuses:

7  students may only perform services on the public for seven hours per day;[186] students must

8  receive specified minimum hours of classroom instruction before they may work on members of

9  the public;[187] and the Board will not license a school unless the applicant provides a copy of the

10  student enrollment contract.[188]

11        Even though the massive exceptions for many (but not all) practicing makeup artists

12  undercut the State's asserted health and safety interest, the State nonetheless retains legitimate

13  interests in consumer protection and in the health and safety of makeup artistry instructors,

14  students, and the public who receive services at makeup artistry schools.

15        **c.**     **Rational Relationship to the State's Interests**

16        The dispositive question, then, is whether the requirements for schools of cosmetology,

17  and for licensed instructors at schools of cosmetology, are rationally related to the State's

18  legitimate interests.  Plaintiffs contend the entire regulatory scheme, as applied to them, is

19  irrational.  On the present record, I disagree.  For example, the regulations provide detailed

20  guidelines on how various forms of creams, lotions, cosmetics, and powders must be stored and

21  applied.[189]  These guidelines directly address health and safety concerns at schools of

22  cosmetology, as do the regulations prohibiting hazardous substances in the cosmetics used at

23

24

---

25     [185] *Armour*, 132 S. Ct. at 2080–81.

26     [186] NRS § 644.400(2)(f).

   [187] NRS § 644.408.

27     [188] NRS § 644.380(1)(f).

28     [189] NAC § 644.345.

1   schools of cosmetology.[190]  Invalidating the entire school of cosmetology regulatory scheme, as

2   applied to makeup artistry schools, would be a step way too far.

3          However, because some of Plaintiffs' particular grievances have merit, I will address each

4   specifically.  Plaintiffs contend that the requirements for schools of cosmetology, as applied to

5   makeup artistry, are irrational because (i) the mandatory cosmetology and aesthetics curricula are

6   overbroad, as they require instruction on tasks that makeup artists do not perform; (ii) the

7   mandatory curricula is underinclusive, as they include makeup instruction only in the most basic

8   sense; (iii) the mandatory curricula expose instructors and students to dangers they would not

9   otherwise face in the course of teaching makeup artistry—namely, sharp instruments and various

10  chemicals; (iv) the mandated equipment is excessive, as hair and nail care equipment is entirely

11  unnecessary to teach makeup artistry; and (v) cosmetologist and aesthetician licensing exams

12  only superficially test basic makeup application.

13         Plaintiffs argue next that the mandatory curriculum to become a licensed cosmetology

14  instructor is irrelevant to teaching makeup artistry because (i) the 500 to 1,000 hours of required

15  training (depending on whether one is a provisional instructor) do not include any instruction in

16  makeup artistry; and (ii) the instructor licensing exam does not contain any questions about

17  makeup artistry.

18                     **i.        Requirements for Schools of Cosmetology**

19         In pertinent part, the statute requires that a school of cosmetology must:

20     (1) "[c]ontain[] at least 5,000 square feet of floor space and adequate
           equipment";[191]

21

22     (2) "[m]eet[] all requirements established by regulations of the Board";[192]

23     (3) "maintain a staff of at least two *licensed instructors* and one additional
           instructor for each 25 enrolled students, or major portion thereof, over 50

24

25

26  ───────────────

27     [190] NAC § 644.372.

    [191] NRS § 644.380(2)(b).

28     [192] NRS § 644.380(2)(e).

1
2
3
4
5
6

students. . . . Persons instructing pursuant to provisional licenses [under] NRS
§ 644.193 are considered instructors for the purposes of this section.";[193]

(4) "at all times be under the immediate supervision of a *licensed instructor* who
has had practical experience of at least 1 year in the majority of the branches of
cosmetology in an established place of business";[194]

(5) "maintain a course of practical training and technical instruction equal to the
requirements for examination for a license as a *cosmetologist*";[195]

(6) "[m]aintain apparatus and equipment sufficient to teach all the subjects of its
curriculum";[196]

7   Of these requirements, only the fourth, fifth and a portion of the first may possibly not be

8   rationally related to the State's legitimate interests in health and safety and consumer protection.

9   There is no reason to believe that 5,000 square feet is an irrational minimum size for a makeup

10  artistry school; requiring two instructors (and one more for each 25 students) is a rational,

11  minimal step to promote adequate contact between teachers and students and student oversight;

12  and the remainder of the first, second, third, and sixth requirements give sufficient discretion to

13  school operators to run their facilities as they see fit.

14          I begin with the analysis of the fifth requirement—that makeup artistry schools must

15  "maintain . . . training and . . . instruction equal to the requirements for examination for a license

16  as a *cosmetologist*."[197]  That requirement is unconstitutional as applied to makeup artistry schools.

17  This requirement effectively mandates that makeup artistry schools provide curricula designed to

18  enable students to pass the cosmetology licensing exam.  Yet Plaintiffs' students do not desire to

19  become licensed cosmetologists, and the cosmetology curriculum is both overbroad and

20  underinclusive in relation to what makeup artists need to learn, at a practical level and for health

21  and safety concerns.

22          The statute provides permissive guidelines for the cosmetologist exam:

23          Examinations for licensure as a cosmetologist may include:

24
25  [193] NRS § 644.395 (emphasis added).

26  [194] NRS § 644.400(1) (emphasis added).

    [195] NRS § 644.400(2)(a) (emphasis added).

27  [196] NRS § 644.400(2)(b).

28  [197] NRS § 644.200(2)(a) (emphasis added).

1        1. Practical demonstrations in shampooing the hair, hairdressing, styling of
2        hair, finger waving, coloring of hair, nail technology, cosmetics, thermal
         curling, marcelling, facial massage, massage of the scalp with the hands,
         and cutting, trimming or shaping hair;

3        2. Written or oral tests on:

4                (a) *Antisepsis, sterilization and sanitation*;

5                (b) The use of mechanical apparatus and electricity as applicable to
                 the practice of a cosmetologist; and

6
7                (c) The laws of Nevada and the regulations of the Board relating to
                 the practice of cosmetology; and

8        3. Such other demonstrations and tests as the Board may require.[198]

9    Only paragraph 2.(a)—testing on "[a]ntisepsis, sterilization and sanitation"—bears any direct

10   relationship to practicing makeup artistry.

11       The regulations that flesh out the statute include more detailed examination and curricular

12   requirements for cosmetology:

13       An examination for licensure as a cosmetologist will include, but is not limited to,
         a test on:
14
         1. *Infection control and safety*;
15       2. The provisions of this chapter and chapter 644 of NRS;
         3. Chemical treatments;
16       4. Haircutting;
         5. Arching of the eyebrow;
17       6. Hot work;
         7. Shampoo; and
18       8. Manicure, pedicure, and wrapping and extending fingernails.[199]

19   Similar to the statutory guidelines, these requirements include only one element that is directly

20   relevant to makeup artistry: infection control and safety.  To prepare for this exam, makeup

21   artistry students would need to learn many tasks that they would not perform in practice.  And

22   only one out of eight exam topics—infection control and safety—is rationally related to the

23   State's health and safety interest.[200]  More importantly, the State need not require the other seven

24   topics to fulfill its interest in educating makeup artists how to practice safely.

25

26       [198] NRS § 644.240 (emphasis added).

27       [199] NAC § 644.051 (emphasis added).

28       [200] *See Cornwell*, 80 F. Supp. 2d at 1115 (noting that only about 10% of the cosmetology exam
     subjects were applicable to natural hair care).

The detailed curriculum for cosmetologists demonstrates the same points:

Each school of cosmetology *must* offer the following subjects for training barbers and students to be cosmetologists:

> (a) Blow-drying.
> (b) Dispensary.
> (c) Extensions and wrapping of nails.
> (d) Facials, arching, skin and make-up.
> (e) Finger waving.
> (f) Hair coloring.
> (g) Haircutting.
> (h) Manicuring.
> (i) Miscellaneous practical and technical instruction, including, without limitation, field trips relating to the practice of cosmetology.
> (j) Modeling.
> (k) *The provisions of this chapter and chapter 644 of NRS.*
> (l) Pedicuring.
> (m) Permanent waving and chemical straightening.
> (n) Reception desk training.
> (o) Salon management.
> (p) Scalp treatments.
> (q) Shampooing and rinses.
> (r) Skipwaving.
> (s) Theory, with a minimum of 50 hours mandatory for students who are barbers and 250 hours mandatory for all other students.
> (t) Thermal straightening, curling and marcelling.
> (u) Wet hairdressing.
> (v) Wigs and hairpieces.[201]

Of these subjects, only one may be rationally related to the health and safety concerns of makeup artists: learning the provisions of the cosmetology statute and regulations. Yet this is a fairly indirect relationship which teaches sanitation by requiring students to become generally familiar with the statute and regulations. There is no reason why makeup artistry instructors should be compelled to teach—and makeup artistry students should be compelled to learn—this laundry list of subjects that are, save one, wholly unrelated to makeup artistry.[202] The State's legitimate health and safety interest is not furthered by this overbroad curriculum.[203] Accordingly, NRS § 644.400(2)(a)'s requirement that schools must prepare students for the cosmetologist license

---

[201] NAC § 644.115(1) (emphasis added).

[202] *See Cornwell*, 80 F. Supp. 2d at 1110–11; *Clayton v. Steinagel*, 885 F. supp. 2d 1212, 1215 (D. Utah 2012).

[203] Plaintiffs submitted purported copies of the textbooks used to teach cosmetology. (Dkt. Nos. 27-19 to 27-22.) I must disregard those exhibits, however, because they are not authenticated. *See* FED. R. EVID. 901.

examination is unconstitutional as applied to makeup artistry schools.  The State has a legitimate

interest in ensuring that makeup artistry is taught and practiced in a safe manner, but it is

irrational to further that interest by imposing a significantly overbroad curriculum on makeup

artistry students and by requiring makeup artistry instructors to undergo testing in areas that are

irrelevant to the instruction of makeup artistry.[204]

As to equipment, the statute's language is acceptable, as it requires only "adequate

equipment."[205]  The related regulations, however, require a plethora of equipment that is wholly

unnecessary to effectuate the State's legitimate interest in ensuring that makeup artistry is safely

taught.  The regulations mandate the following "[m]inimum requirements for equipment":

> Each school must have the following working equipment:
>
> 1. Ten shampoo bowls that are located so that all 10 bowls may be in use at the same time.
>
> 2. Ten hair dryers, each of which must be equipped with a chair and a device that releases air on the client's hair. . . .
>
> 3. Two facial chairs.
>
> 4. Ten manicure tables or bars, and stools.
>
> 5. *Adequate wet and dry disinfectants that are registered with the Environmental Protection Agency.*
>
> 6. Hot work equipment consisting of:
>
> > (a) Five electric heaters.
> >
> > (b) Combs, as follows:
> >
> > > (1) Fine-teeth combs;
> > > (2) Coarse-teeth combs;
> > > (3) Five electric pressing combs;
> > > (4) One shampoo comb per student;
> > > (5) Hard rubber combs; and
> > > (6) Styling combs.

---

[204] Plaintiffs' expressed concerns about makeup artistry instructors and students facing unnecessary danger with sharp instruments and non-makeup related chemicals is alleviated by not requiring the cosmetology curriculum in makeup artistry schools.

[205] NRS § 644.380(2)(b).

(c) Curling irons, as follows:

    (1) Twenty marcelling irons with revolving handles; and
    (2) One electric curling iron per student.

(d) Oils and conditioners consisting of:

    (1) Pressing oils;
    (2) Scalp conditioners;
    (3) Hair conditioners for pressed hair made without a soap base, such as petroleum jelly;
    (4) Curling creams made with wax or other acceptable oils; and
    (5) Products for cleaning curling irons.

7. Ten dozen cold-wave rods of assorted sizes.

8. One covered container for hairpins, clips, nets and similar items for each student.

9. Five brushes, furnished by the school, for each student.

10. *Closed waste containers of sufficient size and in sufficient quantity to permit the disposal of all refuse and waste matter by the school and its students.*

11. *One block, weft or mannequin on a firm stand for each beginning student.*

12. *One time clock which punches the date and time on time cards, or a computer or any other device approved by the Board, for use by the students to record their hours of training at the school.*

13. Two shampoo capes for each student.

14. *One chair for each student, or a sufficient number of tables and chairs for all of the students, in classes on theory.*

15. *Mirrors, worktables and styling chairs of sufficient number to accommodate the students enrolled.*

16. *At least one textbook per student and adequate reference material, charts, teaching aids and other materials to support the instruction in the school.*

17. *Adequate and safe electrical outlets.*[206]

Far less than half of these items are rationally related to makeup artistry instruction: item numbers five, ten, eleven, twelve, fourteen, fifteen, sixteen and seventeen (in italics above).  The remaining items appear to relate only to hair care, nail care, and giving facials.  The health and safety of those involved in makeup artistry instruction is not dependent on providing physical equipment whose only purpose is to provide instruction for non-makeup branches of cosmetology.

---

[206] NAC § 644.085 (emphasis added).

Therefore, NAC § 644.085(1)–(4), (6)–(9), and (13) are unconstitutional as applied to makeup artistry schools.

The regulations also mandate "[m]inimum requirements for space and accommodations," all of which survive a rational basis analysis: 5,000 square feet of floor space, "properly equipped lecture rooms of sufficient size to accommodate all students," and separate lockers for each student.[207]

### ii.        Requirements for Licensed Instructors

The fourth requirement under NRS Chapter 644 listed above for makeup artistry schools mandates that such schools "be under the immediate supervision of a licensed instructor who has had practical experience of at least 1 year in the practice of a *majority* of the branches of cosmetology in an established place of business."[208]  The second part of this requirement is problematic because only a licensed cosmetologist could practice four of the six branches: cosmetology, aesthetics, hair design, and hair braiding.[209]  The precise issue is whether requiring at least one instructor in a makeup artistry school to be a licensed cosmetologist is rationally related to the State's health and safety interests.

A cosmetologist engages in the practices of:

(a) Cleansing, stimulating or massaging the scalp or cleansing or beautifying the hair by the use of cosmetic preparations, antiseptics, tonics, lotions or creams.

(b) Cutting, trimming or shaping the hair.

(c) Arranging, dressing, curling, waving, cleansing, singeing, bleaching, tinting, coloring or straightening the hair of any person with the hands, mechanical or electrical apparatus or appliances, or by other means, or similar work incident to or necessary for the proper carrying on of the practice or occupation provided by the terms of this chapter.

(d) Removing superfluous hair from the surface of the body of any person by the use of electrolysis where the growth is a blemish, or by the use of depilatories, waxing, tweezers or sugaring, except for the permanent removal of hair with needles.

---

[207] NAC § 644.080.

[208] NRS § 644.400(1) (emphasis added).

[209] *See* NRS § 644.023.

(e) Manicuring the nails of any person.

(f) Beautifying, massaging, stimulating or cleansing the skin of the human body by the use of cosmetic preparations, antiseptics, tonics, lotions, creams or any device, electrical or otherwise, for the care of the skin.

(g) Giving facials or skin care or *applying cosmetics or eyelashes to any person.*[210]

As can be readily seen, the vast majority of cosmetologists' competencies have nothing to do with makeup artistry, let alone makeup application of any sort. Only "applying cosmetics or eyelashes to any person" relates to the practice of makeup artistry.[211] There is no rational relationship between the State's health and safety goals and the requirement that at least one instructor at a makeup artistry school be a licensed cosmetologist. While licensed cosmetologists would have learned how to perform their non-makeup related tasks in a sanitary manner, it is entirely unclear how that knowledge is relevant to teaching makeup artistry. Moreover, it is unclear how a supervisor/instructor would be better-suited to supervise a makeup artistry school because that person is a licensed cosmetologist.[212]

This is not to say that instructors at makeup artistry schools may be unlicensed, or that they need not have any occupational license at all to become an instructor, or even that the State may not require any practical experience to become an instructor.[213] I hold merely that NRS § 644.400(1) is unconstitutional as applied to makeup artistry schools in one limited respect: its requirement that the supervisor/instructor be a cosmetologist (that is, have "practical experience of at least 1 year in the practice of a majority of the branches of cosmetology in an established place of business"). That requirement is not rationally related to the State's interests.

However, as discussed above, there is sufficient overlap between the practices of aesthetics and makeup artistry such that requiring the mandatory supervisor/instructor under NRS § 644.400(1) to be a licensed instructor of aestheticians could pass constitutional muster. Such a

---

[210] NRS § 644.023(1) (emphasis added).

[211] NRS § 644.023(1)(g).

[212] *See Cornwell*, 80 F. Supp. 2d at 1117–18.

[213] *See Merrifield*, 547 F.3d at 987 (upholding training requirements that include work with pesticides for exterminators who do not use pesticides).

requirement would further the State's legitimate interests in promoting health and safety and in assuring that makeup artistry instructors obtain some minimal level of competency as teachers.[214] That second interest is rationally achieved through the statutory requirements for aesthetics instructors under NRS § 644.1955, the required instructors' curriculum under NAC § 644.123(1), and the mandatory instructor's exam under NAC § 644.052.  The exam's relevance to teaching is evident, as 53% of it is dedicated to effective teaching methods and methods of assessment for student learning, and 47% of it is dedicated to classroom management.[215]

### G.     Fourteenth Amendment — Equal Protection

#### 1.     Treating Like Groups Differently

Plaintiffs contend that treating practicing makeup artists differently than makeup artistry instructors—by requiring instructors to obtain licenses and allowing practitioners to proceed without—violates the Equal Protection Clause.  Because Plaintiffs are not in a protected class, rational basis applies.[216]  As explained above, the State could have reasonably concluded that licensing was required for teachers because teachers can inflict more potential harm upon the public.  Also, not all makeup artists may practice without a license.  The excepted categories for film, television, advertising, and photography do not cover all the areas in which makeup artists practice, as Plaintiffs admit.  Thus, Plaintiffs' argument on this point fails.

#### 2.     Treating Different Groups Alike

*Merrifield* indicates that treating different groups alike, as Plaintiffs argue the Board did, is not appropriately framed as an equal protection claim but rather a due process claim.[217]  As Plaintiffs' due process claim is addressed above, there is no need for repetition here.

Based on the foregoing, Plaintiffs' Fourteenth Amendment Equal Protection claims lack merit.

---

[214] *See* NRS § 644.1955.

[215] (Dkt. No. 27-3.)  This document is self-authenticating under Fed. R. Evid. 902(5).

[216] *U.S. v. Juvenile Male*, 670 F.3d 999, 1009 (9th Cir. 2012).

[217] *Merrifield*, 547 F.3d at 985–86.

### H.      Fourteenth Amendment — Privileges or Immunities Clause

As Plaintiffs concede, I am constrained by the Supreme Court's interpretation of the Privileges or Immunities Clause in the *Slaughter-House Cases*.[218]  Relief cannot be had under this clause "unless the claim depends on the right to travel."[219]  I thus grant summary judgment on this claim in the Board's favor, but preserve the claim for possible Supreme Court review.[220]

## III.      CONCLUSION

In accord with the above, I hereby ORDER:

1.  Plaintiffs' motion for summary judgment (Dkt. No. 27) is GRANTED IN PART and DENIED IN PART.  Summary judgment is granted in Plaintiffs' favor on their claims under the Due Process Clause of the Fourteenth Amendment.

    NRS § 644.400(2)(a)'s requirement that schools of cosmetology must prepare students for the cosmetologist license examination is unconstitutional as applied to makeup artistry schools; makeup artistry schools are not required to prepare students for the cosmetologist license examination.

    NAC § 644.085(1)–(4), (6)–(9), and (13) are unconstitutional as applied to makeup artistry schools; makeup artistry schools are not required to provide the equipment mandated by these subsections.

    NRS § 644.400(1) is unconstitutional as applied to makeup artistry schools in one limited respect—the mandatory supervisor/instructor need not have "practical experience of at least 1 year in the practice of a majority of the branches of cosmetology in an established place of business" (that is, be a licensed cosmetologist).

    All other aspects of the cosmetology statutes and regulations remain enforceable against Plaintiffs.

2.  The Board, its agents, and its employees are enjoined from enforcing against Plaintiffs the aforementioned unconstitutional portions of NRS §§ 644.400(2)(a) and 644.400(1), and NAC § 644.085(1)–(4), (6)–(9), and (13).

////

////

---

[218] *Slaughter-House Cases*, 83 U.S. (16 Wall.) 36 (1872).

[219] *Merrifield*, 547 F.3d at 984 (citing *Slaughter-House Cases*, 83 U.S. (16 Wall.) at 77).

[220] *See Clayton v. Steinagel*, 885 F. Supp. 2d 1212, 1213 (D. Utah 2012).

3.   The Board's motion for summary judgment (Dkt. No. 29) is GRANTED IN PART and
      DENIED IN PART.  Summary judgment is granted in the Board's favor on Plaintiffs'
      claims under the First Amendment, the Equal Protection Clause of the Fourteenth
      Amendment, and the Privileges or Immunities Clause of the Fourteenth Amendment.

4.   The Clerk of Court shall enter judgment accordingly.

Dated this 6th day of August, 2014.

_____
ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE